Annamarie LAMONTAGNE

v.

**E.I. DU PONT DE NEMOURS AND COMPANY, INC.**

Doreen A. FESTA

v.

**E.I. DU PONT DE NEMOURS AND COMPANY, INC.**

Susan B. PREGLER

v.

**E.I. DU PONT DE NEMOURS AND COMPANY, INC.**

Nos. 3:91 CV 142 (JAC), 3:91 CV 354 (JAC) and 3:91 CV 355 (JAC).

United States District Court, D. Connecticut.

Dec. 7, 1993.

David Rief, Elizabeth L. McMahon, Susman, Duffy & Segaloff, New Haven, CT, for plaintiffs.

Shelley Wessels, Brown & Bain, Palo Alto, CA, Harry M. Stokes, Wiggin & Dana, New Haven, CT, for defendant.

## AMENDED RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, Chief Judge:

The plaintiffs in these three product liability cases seek damages for personal injuries against the defendant E.I. Du Pont de Nemours & Company ("Du Pont"). These cases were removed to this court from the Superior Court of the State of Connecticut pursuant to 28 U.S.C. § 1441. The court approved consolidation of the three cases, upon stipulation of the parties, on December 30, 1991. Pending before the court is Du Pont's motion for summary judgment.

### BACKGROUND

The plaintiffs are each recipients of a prescription medical prosthesis known as a Proplast TMJ Interpositional Implant ("Proplast TMJ Implant"). The Proplast TMJ Implant was used by oral surgeons to correct defects in the recipient's temporomandibular joint.[1] The Proplast TMJ Implants are alleged to have failed after implantation, causing permanent physical injury.

The Proplast TMJ Implant was designed, manufactured and sold by Vitek, Inc. ("Vitek"), a now-bankrupt Texas company, which marketed the implant only after it received approval to do so from the United States Food and Drug Administration ("FDA"). The Proplast TMJ Implant was composed of various synthetic substances including Proplast—a material designed and manufactured by Vitek. Proplast is made by combining polytetrafluoroethylene (or "PTFE") resins and fibers with either carbon or aluminum oxide.[2] The PTFE used in the Proplast TMJ Implants received by the plaintiffs was purchased by Vitek from the defendant Du Pont, which manufactures PTFE under its tradename "Teflon." Du Pont sells PTFE, or Teflon, in bulk in resin, powder and fiber forms.

The plaintiffs contend that Teflon was not appropriate for use in the Proplast TMJ Implant manufactured and marketed by Vitek. The plaintiff's complaints[3] seek recovery from Du Pont under the Connecticut Product Liability Act, Conn.Gen.Stat. §§ 52–572m *et seq.*, on the theories: (a) that Du Pont was negligent in marketing Teflon to Vitek in the circumstances alleged; (b) that Du Pont failed to issue adequate warnings of the risks associated with the use of Teflon in the Proplast TMJ Implant; and (c) that Du Pont breached the implied warranties of merchantability and fitness for a particular use.

### DISCUSSION

Du Pont has moved for summary judgment against all of the plaintiffs' claims. First, Du Pont contends that the plaintiffs' claims are preempted by federal law in the form of the Medical Device Amendments of 1976 to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (the "MDA").[4] Second,

---

1. The temporomandibular joint or "TMJ" forms the connection between the upper and lower jaw.

2. The manufacture of Proplast involves a complex eight-step process patented by Dr. Charles Homsey, the president and founder of Vitek.

3. A notice of removal of the complaint of the plaintiff Annamarie Lamontagne, Case No. 3:91 CV 142, was filed by the defendant, together with a copy of that complaint on March 7, 1991 ("Lamontagne Complaint"). The defendant filed a notice of removal of the complaint of the plaintiff Doreen A. Festa, Case No. 3:91 CV 354, together with a copy of that complaint on July 1, 1991 ("Festa Complaint"). Also on July 1, 1991, the defendant filed a notice of removal of the complaint of the plaintiff Susan B. Pregler, Case No. 3:91 CV 355, together with a copy of that complaint ("Pregler Complaint"). The Lamon-

tagne, Festa and Pregler Complaints are substantively identical and will be hereinafter referred to collectively as the "Complaints."

4. Du Pont initially raised the issue of federal preemption in a footnote in its Reply Memorandum in Support of Defendants' [sic] Motion for Summary Judgment (filed Mar. 6, 1992) ("Reply Memorandum"). *See* Reply Memorandum at 6 n. 5. The argument is made more extensively in the Defendant's Second Supplemental Memorandum (filed March 29, 1993) ("Defendant's Second Memorandum") at 2–20 and in the Defendant's Third Supplemental Memorandum in Support of Motion for Summary Judgment (filed June 29, 1993) ("Defendant's Third Memorandum") at 5–10.

even if the plaintiffs' claims are not preempted, Du Pont argues, it is nonetheless entitled to summary judgment. Du Pont contends that "all of the plaintiffs' claims are based on the false premise that because Du Pont provided Vitek with raw material, Du Pont had a legal responsibility to assure that Vitek's specialized medical use of that raw material was safe." [5] Du Pont maintains, rather, that "[a]s a bulk material supplier to a medical product manufacturer, Du Pont had no duty to assure the safety of the Proplast TMJ Implant designed, manufactured, tested and sold by Vitek." [6] Because it had no duty to prevent or warn of any defects or dangers in the specialized application of the Proplast TMJ Implant, Du Pont claims that it is entitled to summary judgment on all of the plaintiffs' claims.

## I.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original). While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (Feinberg, C.J.), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The non-moving party may defeat the summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Finally, " 'mere conclusory allegations or denials' " in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (*quoting SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)).

## II.

We address first the question of whether the plaintiffs' claims are preempted by federal law. We begin with a discussion of the general principles of federal preemption before turning specifically to the MDA and the Proplast TMJ Implant at issue here.

## A.

Article VI of the Constitution provides that the laws of the United States "shall be the supreme law of the land; and the judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State notwithstanding." State laws which "interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution are invalid." *Wisconsin Public Intervenor v. Mortier*, —— U.S. ——, ——, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532 (1991) (*citing Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)). The ways in which federal law may preempt state law are "well established and in the first instance turn on Congressional intent," *id.*; the " 'purpose of Congress is the ultimate touchstone' of pre-emption analysis." *Cipillone v. Liggett Group, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (*quoting Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978)).

Congress' intent to preempt state law in a given field may be stated expressly

---

**5.** Memorandum in Support of Motion for Summary Judgment (filed Jan. 15, 1992) ("Defendant's Memorandum") at 2.

**6.** *Id.* at 19.

in a statute, *see Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977), or may be expressed implicitly by the enactment of "a scheme of federal regulation 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Wisconsin Public Intervenor,* —— U.S. at ——, 111 S.Ct. at 2481 (*quoting Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Implied preemption also occurs when compliance with both federal and state regulations is an impossibility. *See Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). Further, as the Supreme Court recently stated in *Cipillone,* "[w]hen Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority,' there is no need to infer congressional intent to preempt state laws from the substantive provisions of the legislation." —— U.S. at ——, 112 S.Ct. at 2618 (citations omitted). Finally, the consideration of the defendant's preemption arguments must start " 'with the assumption that the historic police powers of the States [are] not to be superseded by ... [a] Federal Act unless that [is] the clear and manifest purpose of Congress.'" *Id.* at ——, 112 S.Ct. at 2617 (*quoting Rice,* 331 U.S. at 230, 67 S.Ct. at 1152).

## B.

### (1)

Before considering Du Pont's argument that the MDA preempts the plaintiffs' state law claims, we review briefly the scope and operation of that statute. The MDA gives the FDA regulatory authority over medical devices and authorizes that agency to promulgate implementing regulations. 21 U.S.C. § 371(a). Manufacturers of medical devices are required under the MDA to register each device with the FDA prior to commencing manufacture. *See* 21 U.S.C. § 360(c). The MDA also sets forth in Section 331 certain "prohibited acts" on the part of medical device manufacturers, which include the introduction into interstate commerce of any device that is misbranded or adulterated, 21 U.S.C. § 331(a),[7] the failure to register a device, 21 U.S.C. § 331(p), and the submission of any false or misleading report that is required under the MDA. Prohibited acts are punishable by fines, penalties and imprisonment. 21 U.S.C. § 333.

After registration, medical devices are classified according to the level of regulatory control the FDA determines is necessary to provide for the safety and effectiveness of the device. *See* 21 U.S.C. § 360c. There are three levels of classification. If the FDA determines that so-called "general controls" are "sufficient to provide reasonable safety and effectiveness of the device," it is placed in Class I. 21 U.S.C. § 360c(a)(1)(A). "General controls" include various reporting requirements as well as provisions for inspection by the FDA and for notification and recall of devices subsequently determined to present an unreasonable risk of substantial harm to public health. *See* 21 U.S.C. §§ 360, 360f, 360h, 360i, 360j. If the requirements of "general controls" are insufficient to assure the device's safety and effectiveness, thereby necessitating the implementation of "special controls" such as "performance standards, postmarket surveillance, [and] patient registration," then a device will be placed in Class II. 21 U.S.C. § 360c(a)(1)(B). Finally, if "general" and "special controls" are together insufficient and "pre-market approval" is required, a device is placed in Class III. 21 U.S.C. § 360c(a)(1)(C). The premarket approval process requires the registrant to submit a detailed application to the FDA, including information pertaining to product specifications, intended use, manufacturing methods, and proposed labelling before marketing the product. *See* 21 U.S.C. § 360e(c).

---

**7.** Misbranding is defined in 21 U.S.C. § 352. Under that section, a device is misbranded unless, among other things, "its label bears ... such adequate warnings against use in those pathological conditions ... where its use may be dangerous to health."

### (2)

■ The basis of Du Pont's preemption argument is Section 360k(a) of the MDA, which provides in pertinent part that

no State or political subdivision of a State may establish or continue in effect with respect to any device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety and effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).[8] Because the MDA thus expressly preempts some aspects of state law, and because it is a "reliable indicium" of congressional intent, the preemption provisions of the MDA, rather than the implied preemptive effect inferred from the substantive portions of the MDA, guide our inquiry here. *Cipillone,* —— U.S. at ——, 112 S.Ct. at 2617–18; *see also King v. Collagen Corp.,* 983 F.2d 1130, 1134 (1st Cir.1993) (MDA § 360k forecloses inquiry into implied preemption); *Stamps v. Collagen Corp.,* 984 F.2d 1416, 1420 (5th Cir.1993) (express preemption provision of MDA precludes resort to implied preemption).

■ We turn first to the FDA's own understanding of Section 360k(a) for guidance. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (agency's interpretation of its own statute controlling unless contrary to congressional intent); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945) (agency's construction of a statute is entitled to "control-

ling weight unless it is plainly erroneous or inconsistent with the regulation"). The FDA has interpreted Section 360k(a) of the MDA as preempting "any requirements established by a state including statutes, regulations, court decisions or ordinances." 21 C.F.R. § 808.1(b) (1992); *see also San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959) ("[State] regulation can be as effectively asserted through an award of damages as through some form of preventative relief. The obligation to pay compensation can be, and is indeed designed to be, a potent method of governing conduct and controlling policy."). The great majority of the courts which have analyzed the meaning of state "requirements" under Section 360k have thus found that the preemptive effect of the MDA extends to state tort actions. *See, e.g., King,* 983 F.2d at 1134; *Stamps,* 984 F.2d at 1420–21; *Slater v. Optical Radiation Corp.,* 961 F.2d 1330, 1332–33 (7th Cir.1992) (Posner, J.); *Cameron v. Howmedica, Div. of Pfizer Hosp. Prod. Group, Inc.,* 820 F.Supp. 317, 319 (E.D.Mich.1993); *Covey v. Surgidev Corp.,* 815 F.Supp. 1089, 1094 (N.D.Ohio 1993); *Lindquist v. Tambrands, Inc.,* 721 F.Supp. 1058, 1063 (D.Minn.1989); *Larsen v. Pacesetter Systems, Inc.,* 74 Haw. 1, 837 P.2d 1273, 1281–82 (1992).[9] This court agrees with the prevailing view that the plaintiffs' state law tort claims are within the definition of state "requirements" that may be preempted under Section 360k.

The FDA regulations under Section 360k further interpret the preemptive scope of that statute to provide that

State or local requirements are preempted only when the Food and Drug Administration has established *specific counterpart*

---

8. Subsection (b) of 21 U.S.C. § 360k provides that a state may petition the FDA in certain circumstances to allow state requirements with respect to medical devices to be exempted from the preemption provision of subsection (a). Since no such petition affects the instant case, we limit our attention here to subsection (a).

9. The court in *Lindquist* noted that
of eighteen courts that have considered [whether a state's general tort law standards are preempted by the MDA], seventeen have either implicitly or explicitly reached the con-

clusion that a jury verdict in a tort suit under state law is a requirement for purposes of Section 521(a) [21 U.S.C. § 360k] and is therefore preempted.

721 F.Supp. at 1062. The *Lindquist* Court cited one decision of one district court which, in its view, adopted a contrary rule: *Musatko v. International Playtex, Inc.,* No. 85–C–1540, slip op. (E.D.Wis. May 14, 1987). *Id.* at n. 2. We know of no other decision of any court holding that the preemptive effect of Section 360k does not extend to state tort actions.

*regulations or there are other specific requirements applicable to a particular device* under the act, thereby making any existing divergent State or Local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.

21 C.F.R. § 808.1(d) (1992) (emphasis supplied). In other words, FDA regulations provide that "preemption does not apply when the FDA has issued no regulations or other requirements specific to the particular device." *King,* 983 F.2d at 1134; *see also Larsen,* 837 P.2d at 1282.[10] Accordingly, a plaintiff's state law tort claim is preempted only if (1) the FDA has established regulations specific to the medical device at issue in the particular case; (2) the state law claim constitutes a requirement different from, or in addition to, any requirement the FDA has made applicable to the device at issue; and (3) the claim relates to either the safety or effectiveness of the device or to any other matter included in a requirement made applicable to the device by the MDA.

(3)

■ Although, as discussed below, Du Pont has shown that the FDA had issued regulations specific to the Proplast material that was used to make the implants received by the plaintiffs, preemption under Section 360k is not appropriate in the instant case because Du Pont has failed to demonstrate that the FDA issued regulations specific to the Proplast TMJ Implant—the specific device which allegedly harmed the plaintiffs— as required by the FDA regulations implementing Section 360k.

Pursuant to the MDA, "PTFE with carbon fibers composite implant material" was reviewed by three Device Classification Panels of experts in various fields.[11] Proplast is the

Vitek tradename for such PTFE material. In 1980, the Dental Device Classification Panel recommended that the PTFE material be placed in Class II. 45 Fed.Reg. 86031 (Dec. 30, 1980). The FDA agreed with the recommendation of the Dental Device Panel and proposed that PTFE vitreous carbon materials be placed in Class II. *Id.* Ultimately, in 1987, the FDA issued a regulation classifying the materials as a Class II dental prosthetic device. 52 Fed.Reg. 30097 (Aug. 12, 1987); 21 C.F.R. § 872.3680 (1992). The General and Plastic Surgery Device Classification Panel and the Ear, Nose and Throat Device Classification Panel also each reviewed the PTFE material for use in areas appropriate to their respective medical specialties and recommended to the FDA that the material be placed in Class II. 47 Fed. Regs. 2810, 2818 (Jan. 19, 1982). The FDA agreed with the recommendations of these two panels and, in a 1988 regulation, the PTFE material was classified as a Class II plastic surgery prosthetic device. 53 Fed. Reg. 23872 (June 24, 1988); 21 C.F.R. § 878.3500 (1992). It is therefore clear that the FDA has established specific regulations with respect to Proplast implant material made with PTFE.

The plaintiffs argue, however, that Du Pont cannot establish preemption under the MDA because the FDA did not classify the Proplast TMJ Implant itself, and that it is the safety of *that* device—and not the safety of Proplast material generally—which is at issue here.[12] The court agrees. FDA approval and regulation of the Proplast implant material alone cannot support preemption of the plaintiffs' claims with respect to the Proplast TMJ Implant, which is a different medical device entirely.

The record reveals that the Proplast TMJ Implant was not the subject of any specific

---

10. In 1990 and 1992, Congress enacted amendments to the MDA, leaving 21 C.F.R. § 808.1(d) intact, suggesting that the regulation is consistent with congressional intent regarding preemption under Section 360k.

11. Under Section 360c(b), the FDA is required to establish panels of experts "according to the various fields of clinical medicine and fundamental sciences in which devices used for human use are used." These panels then review devices to

be classified by the FDA and provide to the FDA a recommendation regarding classification of the device and regulatory measures with respect to the device that the panels determine are appropriate.

12. *See* Plaintiffs' Second Supplemental Memorandum in Opposition to Motion for Summary Judgment (filed Mar. 29, 1993) ("Plaintiffs' Second Memorandum") at 2–5.

regulation issued by the FDA. On the contrary, that device was marketed between 1983 and 1991 without ever having been specifically classified by that agency. Vitek notified the FDA, by a letter dated November 23, 1982, of its intention to market the Proplast TMJ Implant (the "Notification Letter").[13] In the Notification Letter Vitek expressed its view that the Proplast TMJ Implant was "substantially equivalent" to other devices which were marketed in interstate commerce before May 28, 1976—the date the MDA was enacted.[14] Vitek claimed the Proplast TMJ Implant was substantially equivalent to the Proplast material, which had been marketed prior to the effective date of the MDA and which had been recommended prior to the Notification Letter for placement into Class II by the three Device Classification panels.[15] By a letter dated March 23, 1983, the FDA responded to the Notification Letter and approved the commercial distribution of the Proplast TMJ Implant ("Approval Letter").[16] In the Approval Letter, the FDA stated that it had

> determined the device [the Proplast TMJ Implant] to be substantially equivalent to one marketed in interstate commerce prior to May 28, 1976, the enactment of the Medical Device Amendments of 1976. You may, therefore, market your device subject to the *general controls* provisions of the

Federal Food, Drug, and Cosmetic Act (Act) until such time as your device has been classified under Section 513 [21 U.S.C. § 360c]. At that time, if your device is classified into either class II (Standards) or class III (Premarket Approval), it would be subject to additional controls.

(emphasis supplied). In other words, in 1983, the FDA had not yet classified the Proplast TMJ Implant under the MDA, but it had determined that the device was "substantially equivalent" to the Proplast material already in use prior to the enactment of the MDA in 1976 and that Vitek could market the Proplast TMJ Implant on that basis. The Approval Letter also states that it "should not be construed as approval of your device or its labelling." By thus demonstrating substantial equivalence, Vitek was able to market the Proplast TMJ Implant subject only to the "general controls" of the MDA.

The plaintiffs all received their Proplast TMJ Implants between 1985 and 1986—that is, prior even to the classification of the Proplast material by the FDA in 1987.[17] There is no evidence in the record of any promulgation by the FDA of any regulation on the Proplast TMJ Implant between the date of the Approval Letter in 1983 and 1991. A letter from the FDA to Vitek, dated January 26, 1991, indicates that, by that date, the

13. The Notification Letter is Exhibit B to the Plaintiffs' Second Supplemental Memorandum. Under 21 U.S.C. § 360(k) and 21 C.F.R. § 807 (1992) every manufacturer of drugs or medical devices must register with the FDA prior to engaging in the manufacture or processing of any drug or device. Moreover, at least ninety days prior to introducing any medical device into interstate commerce, a device manufacturer must report to the FDA, *inter alia*, the class into which the device has been classified under 21 U.S.C. § 360c, or if such person determines that the device is not classified under that section, "a statement of that determination and the basis for such person's determination that the device is or is not so classified." 21 U.S.C. § 360(k). Presumably, the Vitek Notification Letter was intended to be such a report under 21 U.S.C. § 360(k) and 21 C.F.R. § 807 (1992).

14. A device introduced into interstate commerce after the effective date of the MDA is automatically classified under Class III, unless it is determined to be "substantially equivalent" to another device which was "introduced or delivered for introduction into interstate commerce for com-

mercial distribution" prior to May 28, 1976 and which has already been classified by the FDA, in which case it is classified into the same class as the device to which it is substantially equivalent. *See* 21 U.S.C. § 360c(f)(1)(A).

15. As noted above, the Proplast implant material was not formally classified by the FDA as a Class II dental prosthetic device until 1987. At the time of the Notification Letter regarding the Proplast TMJ Implants in 1982, Proplast was also in the process of FDA review, albeit at a more advanced stage in that process.

16. The Approval Letter is Exhibit A to the Plaintiffs' Second Memorandum.

17. According to the Complaints, the plaintiff Lamontagne received her implant on May 30, 1986; it was removed on February 17, 1988. The plaintiff Festa received her implant on January 3, 1986; it was removed on September 14, 1988. The plaintiff Pregler received her implant on February 17, 1985; it was removed on May 4, 1989.

FDA had determined that the Proplast TMJ Implants "present an unreasonable risk of substantial harm to the public health" and that "no further implantation of the devices should occur." [18] In 1992, the FDA proposed that all TMJ implants be classified as Class III devices, indicating that they had been "inadvertently omitted from the dental devices considered for classification by the Dental Device Classification Panel and the agency," until 1989. 57 Fed.Reg. 43169 (Sept. 18, 1992).[19]

The evidence produced by the plaintiffs thus suggests that the Proplast TMJ Implants received by the plaintiffs were not classified by the FDA until *after* the plaintiffs received them, nor did the FDA ever issue any regulations *specific to* the Proplast TMJ Implant. Du Pont has offered no evidence to the contrary.[20] Accordingly, the defendant has failed to meet the requirements of the regulations under Section 360k for preemption of the plaintiffs' claims and summary judgment on that ground is inappropriate.

(4)

■ Had the FDA issued regulations specific to the Proplast TMJ Implant, it is arguable that some or all of the plaintiffs' claims against Du Pont would have been preempted by federal regulation of Vitek, the manufacturer of the medical device at issue. Du Pont, however, raises a second preemption argument that is not predicated on the FDA's regulation of Vitek and its Proplast TMJ Implant. Du Pont claims that, apart from whatever regulations federal law and the FDA may have imposed upon Vitek, Du Pont's status as a "manufacturer of raw materials" under the MDA constitutes an independent basis for federal preemption.[21]

Du Pont notes that the regulatory scheme of the MDA is entirely addressed to manufacturers and marketers of medical devices (such as Vitek) and that it is those entities that bear the responsibility for registering a device, providing the FDA with a copy of the warnings and labelling that accompany the device, *etc.* Certain other entities are exempted from the registration requirements of the statute, including "[a] manufacturer of raw materials or components to be used in the manufacture or assembly of a device . . .," 21 C.F.R. § 807.65 (1992), "because the Commissioner has found, under section 510(g)(4) of the act [21 U.S.C. § 360(g)(4)], that such registration is not necessary for the protection of the public health." *Id.* Du Pont contends that it is such a "manufacturer of raw materials," and that it is therefore exempt from the registration requirements of the MDA. Du Pont further argues that "[t]he state law requirements which plaintiffs seek to impose upon Du Pont are in direct conflict with the FDA's determination" that a manufacturer of raw materials is exempt from regulation under the MDA.[22] Accordingly, Du Pont maintains, those state requirements are preempted by Section 360(k) of that statute.

This argument is unpersuasive. First, although it is arguable, if not likely, that Du Pont falls within the exemption to regulation under the MDA applicable to "manufacturers

18. Letter of the FDA to Vitek (dated Jan. 26, 1990), Exhibit C to the Plaintiffs' Second Supplemental Memorandum.

19. The TMJ implants addressed in this proposed rule include so-called "interpositional implants" such as the Proplast TMJ Implant at issue here. Also included are "total TMJ prostheses" and "mandibular condyle prostheses."

20. Du Pont does state that "[a]fter Vitek submitted the PROPLAST TMJ Implant in 1982 to the FDA, the FDA reviewed Vitek's application and classified the device as a Class II medical device, 45 Fed.Reg. 86032, thereby making it subject to all of the federal requirements discussed above." Defendant's Second Supplemental Memorandum at 7. However, the referenced page of the Federal Register, which is dated December 30, 1980, concerns a proposed rule of the FDA regarding "tooth shade resin material," and does not appear apposite to our inquiry here. It is conceivable that Du Pont intended to direct the court's attention to 45 Fed.Reg. 86031 (December 30, 1980), which concerns a proposed rule for classifying Proplast material as a Class II device. 45 Fed.Reg. 86031, however, does not address the Proplast TMJ Implant, and in any event was published some two years before Vitek sought approval of that device.

21. *See* Defendant's Third Supplemental Memorandum at 5–10.

22. Defendant's Third Supplemental Memorandum at 9.

of raw materials" (the plaintiffs have not argued otherwise), Du Pont has offered no authority to support federal preemption of state claims against such "manufacturers of raw materials" under the MDA and the court is not aware of any such authority. Second, the fact that "manufacturers of raw materials" are exempted from regulation under the MDA is the reason why federal preemption is arguably *not* appropriate in the circumstances presented. The defendant's argument comes down to the simple proposition that because the FDA has chosen *not* to regulate its conduct, state regulation of that conduct has been displaced. This argument is precisely the reverse of at least one commonly-cited rationale for federal preemption: that Congress has chosen to "occupy the field" in a given area of conduct. *See, e.g., Wisconsin Public Intervenor, —— U.S.* at ——, 111 S.Ct. at 2482; *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Commission*, 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983). Indeed, it could be suggested that the fact that the FDA has chosen not to occupy the field of regulating manufacturers of raw materials in this instance militates *against*, rather than in favor of, preemption. The absence of federal regulation in a given area may suggest that Congress intended to leave "the police power of the State undisturbed except as the state and federal regulations collide." *Rice*, 331 U.S. at 231, 67 S.Ct. at 1152 (collecting cases). Moreover, the defendant's argument that state requirements imposed by the theories of liability that underlie the plaintiff's claims (such as the imposition of a state law duty to warn) would contradict the MDA finds no support in that statute. The court knows of no provision of the MDA or the regulations thereunder which states that manufacturers of raw materials *shall not* be regulated. Rather, the FDA has simply determined that for its own purposes such regulation is unnecessary. *See* 21 C.F.R. § 807.65 (1992) (Commissioner has determined that regulation of raw materials manufacturers not necessary for the protection of public health). State law requirements, to the extent that they govern the conduct of such "manufacturers of raw materials," thus will not run afoul of any express provision of the MDA or any pronouncement of the FDA.

Accordingly, it is clear that the plaintiffs' state law claims against Du Pont are not preempted by the federal scheme for the regulation of medical devices. The FDA established no "specific counterpart regulations" or "specific requirements applicable to" the Proplast TMJ Implant at issue in this case. Nor does the fact that the FDA has elected not to regulate "manufacturers of raw materials" used in medical devices support federal preemption of state requirements applicable to such raw materials manufacturers. The defendant is thus not entitled to summary judgment based upon federal preemption of the plaintiffs' claims.

### III.

We turn now to Du Pont's contention that, even if the plaintiffs' claims are not preempted by the MDA, it is entitled to summary judgment on those claims on the ground that it had no duty to assure the safety of the Proplast TMJ Implant, since that device was designed, manufactured and sold by Vitek— an independent entity. The defendant makes three basic arguments in support of its claim that it had no legal responsibility to assure the safety of the Proplast TMJ Implant. First, Du Pont argues that Vitek substantially altered the Du Pont Teflon in creating Proplast and in manufacturing the Proplast TMJ Implant, severing any chain of liability leading to Du Pont.[23] Second, it argues that as a supplier of raw materials to a sophisticated purchaser, it cannot be held liable for injuries suffered by the ultimate user of a product incorporating that raw material.[24] Finally, Du Pont suggests that FDA regulation of medical devices places the burden of assuring the safety and efficacy of medical devices on the manufacturer, in this case Vitek, and that it would be unreasonable to impose liability upon a raw materials supplier to such a manufacturer.

23. *See* Reply Memorandum at 15–16.

24. *See* Defendant's Memorandum at 5–6.

### A.

Each of the defendant's three arguments in support of summary judgment is properly evaluated in the context of the Connecticut Product Liability Act, Conn.Gen. Stat. §§ 52–572m et seq. ("CPLA"). All of theories of liability asserted by the plaintiffs fall within the scope of the CPLA. The plaintiffs' Complaints allege negligence, failure to warn and breach of warranty. The CPLA provides in pertinent part that

"Product Liability Claim" includes all claims or actions brought for personal injury ... caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product. "Product Liability Claim" shall include, but is not limited to the following theories: Strict liability in tort; *negligence; breach of warranty*, express or implied; *breach of or failure to discharge a duty to warn* or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent.

Conn.Gen.Stat. § 52–572m(b) (emphasis supplied).

The CPLA creates a consolidated cause of action for all product liability claims. The CPLA provides that "Product Liability Claims" as defined in Section 52–572m "shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty for harm caused by a product." Conn.Gen.Stat. § 52–572n(a). In other words, the CPLA is "an exclusive remedy for claims falling within its scope." *Winslow v. Lewis–Shepard, Inc.*, 212 Conn. 462, 471, 562 A.2d 517 (1989). Accordingly, an action alleging harm from a product due to negligence, for example, may not be pleaded as a separate common law claim but may only be asserted as a part of the CPLA. *Daily v. New Britain Machine Co.*, 200 Conn. 562, 571–72, 512 A.2d 893 (1986); *McKernan v. United Technologies Corp.*, 717

F.Supp. 60, 65 (D.Conn.1989). The consolidated cause of action created by the CPLA means that all product liability claims are governed by a uniform procedure, a uniform set of remedies [25] and a single statute of limitations.[26]

However, the CPLA "certainly retains the plaintiff's right to allege the traditional theories of recovery along with the statutory basis for recovery under one unified count denominated as a 'product liability claim.'" *Savona v. General Motors Corp.*, 640 F.Supp. 6, 9 (D.Conn.1985) (Blumenfeld, J.); *see also Thivierge v. Fortress Scientific Ltd.*, 1993 WL 213891, 1993 Conn.Super. LEXIS 1537, *14 (Superior Court of Connecticut, Judicial District of New London at Norwich, June 14, 1993) ("the [CPLA] did not create a new statutory cause of action; it merely consolidated existing causes of action into a single one"); *Skerritt v. Sandoz Nutrition Corp.*, 1991 WL 60423, 1991 Conn.Super. LEXIS 734, *2 (Superior Court, Judicial District of New Haven at New Haven, March 26, 1991) (Berdon, J.) ("although under the [CPLA] the claimant may only assert a product liability claim, there was no intention on the part of the framers to eliminate the various theories of liability under the common law"). As one Connecticut trial court recently stated, "[t]he purpose of the [CPLA] was to merge the numerous causes of action that have been asserted in common law product liability actions and to create one statutory cause of action, embracing the various theories of liability." *Londrini v. Brito Enterprises*, 1993 WL 328573, 1993 Conn.Super. LEXIS 2134, *4 (Superior Court of Connecticut, Judicial District of New London at Norwich, August 24, 1993).

This conclusion is evident from the fact that the CPLA contains relatively few substantive provisions addressing the elements of *any* theory of recovery for harm caused by a product. While, for example, the CPLA provides for so called "pure com-

---

**25.** *See, e.g.*, Conn.Gen.Stat. §§ 52–240a, 52–240b regarding the recovery of attorney's fees and punitive damages, respectively, in product liability actions; Conn.Gen.Stat. § 52–572n(c) regarding claims for recovery of commercial loss between commercial parties; and Conn.Gen.Stat.

§ 52–572r regarding product liability claims against third parties such as employers.

**26.** *See* Conn.Gen.Stat. § 52–577a (statute of limitations applicable to claims under the CPLA).

parative responsibility" with respect to the recovery of damages in negligence actions for product liability,[27] it is silent as to the other elements of such a negligence claim—*i.e.*, the legal tests for establishing a defendant's duty, breach of that duty or causal responsibility. The existence of a specific provision in the CPLA governing the award of damages recovered under a theory of negligence clearly means that plaintiffs may sue for negligence under that statute. In the absence of any specific provision in the CPLA addressing the defendant's duty under such a theory, however, the test for establishing that element of a plaintiff's case must be governed by the common law of Connecticut as it existed prior to the passage of the CPLA and as modified since the enactment of that statute.[28]

Similarly, the CPLA is utterly silent as to all of the elements of a claim for breach of warranty. If such a theory is asserted under the CPLA, the elements of that claim must be governed by preexisting law.[29]

Finally, although the statute addresses some substantive aspects of a product seller's duty to warn, it does not address all of the applicable elements necessary for recovery under that theory.[30] Those elements must also be derived from Connecticut common law.

In sum, it is clear that the CPLA preserves the common law theories of product liability that were available before its passage.[31] Accordingly, in analyzing the plaintiffs' claims, we look first the CPLA and—

**27.** *See* Conn.Gen.Stat. § 52–572*o*(a), which provides that a plaintiff's damages are diminished in proportion to the plaintiff's own negligence and that the plaintiff may recover even when his proportional negligence exceeds that of the defendant. By contrast, ordinary negligence actions are governed by a "modified" form of comparative negligence under Conn.Gen.Stat. § 52–572h(a). Under the latter statute, a plaintiff may only recover where his proportional negligence is less than that of the defendant.

**28.** Indeed, there are decisions of the courts of Connecticut involving plaintiffs who have sought recovery in products liability claims under the CPLA on the basis that the product seller was negligent. *See, e.g., DeJesus v. Craftsman Machinery Co.,* 16 Conn.App. 558, 548·A.2d 736 (1988), in which the plaintiff sought recovery under the CPLA on theories of strict liability, failure to warn, negligence and breach of warranty. In that case, the Appellate Court upheld a jury verdict in favor of the defendants.

**29.** Despite the absence of any substantive provision regarding breach of warranty under the CPLA, this theory of recovery must nonetheless be available under that statute. Indeed, there are reported cases where plaintiffs have brought such claims. *See, e.g., DeJesus,* note 28, *supra.* Moreover, it would be difficult to conclude both that plaintiffs may sue for negligence under the CPLA and that plaintiffs may *not* recover for breach of warranty under that statute since any supposed preemptive effect of the CPLA is based upon a single statutory provision which itself does not distinguish between claims based on different common law theories—Section 52–572n(a). That statute states simply that claims falling within its scope "shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty for harm caused by a product." It does not

single out negligence, for example, for any particular treatment. In construing a statute and determining its purpose and scope, every part should, so far as possible, be made operative and harmonious with every other part. *Savings Bank of Rockville v. Wilcox,* 117 Conn. 188, 193, 167 A. 709 (1933). In other words, if the CPLA bars *any* formerly available theory of common law products liability, it must bar *all* such theories. Since, as demonstrated above, it does not prevent plaintiffs from asserting claims based on negligence, it cannot reasonably be construed to preclude plaintiffs from asserting claims based on other theories, such as breach of warranty.

**30.** *See* Part III.C.(2), *infra.*

**31.** This conclusion is further supported by a comparison of the CPLA with the Model Uniform Product Liability Act, 44 Fed.Reg. 62714 (Oct. 31, 1979) ("MUPLA"), published by the Department of Commerce, upon which the CPLA was, apparently, loosely based. The MUPLA proposed to "preempt all existing law governing matters within its coverage," *id.* at 62720, replacing all products liability law with a uniform statutory code of product liability. In creating the CPLA, Connecticut apparently adopted, in whole or in part, some ten of the twenty-two sections of the MUPLA. The CPLA is thus significantly less comprehensive in its scope by virtue of having incorporated less than half of the provisions of the MUPLA. Moreover, a side-by-side comparison of the MUPLA and the CPLA reveals that Connecticut did not adopt those portions of the MUPLA providing for preemption of common law theories of recovery. A persuasive case for this conclusion is found in R. Adelman and M. Connors, *The Legal Framework of a Products Liability Case in Connecticut,* —— Conn.B.J. —— (forthcoming 1993).

where that statute is silent—we look to Connecticut common law for guidance.

## B.

 Du Pont first contends that it should be insulated from liability because Vitek substantially changed the Du Pont Teflon, rendering an otherwise safe product dangerous to the plaintiffs. The plaintiffs nowhere argue, nor do they suggest, that Teflon is a dangerous product, except as it was used by Vitek in the Proplast TMJ Implant.[32] Moreover, it is clear that Vitek processed the Du Pont Teflon in a manner that transformed it into an entirely new substance—Proplast. This new material, Du Pont notes, was sufficiently novel and unique to earn its own patent.[33] By changing the Teflon so substantially, Du Pont argues, Vitek severed the chain of liability from Du Pont to the plaintiffs as a matter of law.

The CPLA addresses this issue in Section 52–572p, which provides in pertinent part that

[a] product seller shall not be liable for harm that would not have occurred but for the fact that his product was *altered or modified* by a third party *unless:* (1) The alteration or modification was in accordance with the instructions or specifications of the product seller; (2) the alteration or modification was made with the consent of the product seller; or (3) *the alteration or modification was the result*

*of conduct that reasonably should have been anticipated by the product seller.*

(emphasis supplied). That statute further defines "alteration or modification" to include "changes in the design, formula, function or use of the product from that originally designed, tested or intended by the product seller." *Id.* Du Pont is therefore not liable for the plaintiffs' harm *unless* the processing of its Teflon into Proplast by Vitek for use in the Proplast TMJ Implant "reasonably should have been anticipated" by Du Pont.[34]

Resolving all inferences in favor of the plaintiffs, it is clear that the defendant should not reasonably have anticipated that Vitek would transform its Teflon into Proplast for use in the Proplast TMJ Implant. The plaintiffs argue correctly that there is evidence suggesting that Du Pont was aware that Vitek would incorporate its Teflon into the material Proplast. In 1966, Dr. Charles Homsy wrote a memorandum to his supervisors at Du Pont proposing a venture to develop orthopedic prostheses fabricated in part from Teflon resins.[35] Du Pont declined to pursue the venture and Homsy subsequently left the employ of the defendant to pursue the development of Proplast independently. Evidence produced by the plaintiffs relating to sales of Teflon to Vitek supports the plaintiffs' contention that Du Pont was aware that the Teflon was intended for use in manufacturing Proplast.[36]

---

32. Neither do the plaintiffs appear to argue that Proplast itself was dangerous in applications other than the Proplast TMJ Implant.

33. Defendant's Memorandum at 8.

34. The plaintiffs have nowhere suggested, much less convincingly argued, that Vitek's use of Du Pont Teflon in the Proplast TMJ Implant was either "in accordance with the instructions or specifications of" the defendant, or that Du Pont consented to this use within the meaning of subsections (1) or (2) of Section 52–572p. Accordingly, we limit our attention here to subsection (3) of that statute.

35. *See* Exhibit L to the Plaintiffs' Memorandum, a memorandum of Homsy to D.E. Ells (dated Jan. 3, 1966); Exhibit M to the Plaintiffs' Memorandum, a memorandum of D.E. Ells to O.G. Youngquist (dated Jan. 7, 1966).

36. *See, e.g.,* Exhibit V to the Plaintiffs' Memorandum, a so-called "call report" of a Du Pont salesman dated October 1972 reporting on a sales call to Vitek. That call report states that

Homsy's new "TEFLON"/carbon implant material called "PROPLAST" has been licensed to Smith, Kline & French and appears to have obtained acceptance in a wide range of human implant applications. Vitek will shortly be

However, there is insufficient evidence in the record to create an issue of fact as to whether Du Pont should reasonably have anticipated that Vitek would use Du Pont's Teflon in the Proplast TMJ Implant. In 1984, an employee of Du Pont's Central Research Department, M.W. Bernhardt, attended the American Association of Oral and Maxillofacial Surgeons Clinical Congress. In a memorandum "to file" produced by the plaintiffs, Bernhardt memorialized some of the knowledge he acquired at that conference, including "highlights" of some of the specific papers given there.[37] The plaintiffs contend that the Bernhardt Memorandum establishes Bernhardt's (and therefore Du Pont's) knowledge that Vitek would use Du Pont's Teflon in the Proplast TMJ Implant.[38] The court disagrees. While the "highlights" of the several of the papers in the Bernhardt Memorandum address the use of Proplast in the TMJ, there is no mention of the specific Vitek product at issue—the Proplast TMJ Implant.[39] Although one of the papers given at the conference, entitled "Tissue Response on Metals and Polymers," was given by Homsy, there is no indication that Homsy ever specifically discussed TMJ implants, much less the specific device at issue here— the Proplast TMJ Implant. In short, the Bernhardt Memorandum does not support the plaintiffs' allegation that Du Pont knew Vitek was using its Teflon in that product.

The plaintiffs further allege, however, that Du Pont undertook discussions with Vitek in 1985 "preliminary to entering into a proposed joint venture with regard to the Proplast [TMJ] [I]mplant,"[40] implying that the defendant was thus aware of the product at that time. While there is evidence in the record to suggest that Du Pont and Vitek discussed a potential "cooperative effort" in that year,[41] there is no reference to the nature of that cooperation or whether it involved the Proplast TMJ Implant at issue here.

In sum, the evidence in the record fails to raise a genuine issue of fact as to whether Du Pont should reasonably have anticipated that Vitek would incorporate Teflon into Proplast for use in the Proplast TMJ Implant itself. Although Du Pont may have been aware that its Teflon was being incorporated into the material Proplast, the plaintiffs have not suggested, much less shown, that Proplast is in any way inherently dangerous. It is the use of Proplast in the Proplast TMJ Implant which the plaintiffs claim was inappropriate. There is no indication that Du Pont either knew or should have known that Vitek would substantially alter Du Pont's Teflon by turning it into Proplast and then using the Proplast in the Proplast TMJ Implant, rendering the otherwise safe Teflon dangerous. Absent such evidence, Du Pont cannot be held liable under CPLA § 52–572p for harm caused by the Proplast TMJ Im-

producing basic shapes of "PROPLAST" to supply every hospital in the world.
*See also* Exhibit W to the Plaintiffs' Memorandum, excerpts of the deposition of David A. Sauer (dated Oct. 22, 1991); Exhibit Y to the Plaintiffs' Memorandum, letter of Vitek to Du Pont (dated April 13, 1977).

37. *See* Exhibit EE to the Plaintiffs' Memorandum, the memorandum of M.W. Bernhardt "to file" (dated Feb. 1, 1984) ("Bernhardt Memorandum").

38. Plaintiffs' Memorandum at 14.

39. As noted above in Part II.B.(3), Proplast implant material, as distinguished from the Proplast TMJ Implant itself, was also used in TMJ applications.

40. *See* Plaintiffs' Memorandum at 14.

41. *See* Exhibit FF to the Plaintiff's Memorandum, a letter of Du Pont to Homsy (dated Nov. 7,

1987). The body of that letter states in its entirety as follows.

Attached please find a Strategic Focus Questionnaire which I would appreciate you completing. We have started to use this with perspective [sic] partners and find it very useful in sharpening our thinking and clarifying the basis for negotiations. A very similar format is used by a number of the investment banking firms.

I recognize that a good deal of this information has been discussed verbally, but I believe putting it down in writing will help both parties. All responses should be brief and in bullet form.

I understand our CR & D [Central Research and Development Department] and Polymer Products folks will be visiting you in about a week. I am sorry I can't make that trip, but I believe we have the right technical representative to define the basis for a cooperative effort. Look forward to seeing you again in Houston in the near future.

plant. Accordingly, the defendant is entitled to summary judgment on all of the plaintiffs' claims.

### C.

Even if summary judgment for the defendant were not warranted on the basis of Vitek's substantial alteration and use of Teflon in the Proplast TMJ Implant, the defendant's motion should nonetheless be granted because the defendant owed the plaintiffs no duty on any of the plaintiffs' theories of liability in the circumstances presented.

Du Pont argues that it had no duty to assure the safety of the Proplast TMJ Implant because, as a supplier of raw materials to a sophisticated purchaser, such as Vitek, it should not be held liable for injuries suffered by the ultimate users of a product that incorporates that raw material.[42] In other words, Du Pont contends that, "where it is the specialized use of a component or raw material that allegedly causes a problem, then it is the manufacturer that incorporates that component or raw material into its product that is legally responsible—not the raw materials or component supplier."[43]

The defendant, however, does not make this argument in the context of the CPLA. Moreover, it concedes that it knows of no decision of any court of the State of Connecticut addressing this issue either in the context of medical devices or in any other circumstance.[44] However, Du Pont directs the court's attention to case law from other jurisdictions which have adopted a rule of law similar to that advocated by Du Pont here.[45] The defendant also relies upon several policy arguments which it contends support the

adoption of the "sophisticated user/bulk supplier defense" under Connecticut law. Finally, Du Pont maintains that a rule holding that raw materials suppliers owe no duty in such circumstances would be consistent with existing decisions of the federal courts applying Connecticut law in cases concerning a drug manufacturer's duty to warn consumers of the risks associated with prescription drugs.[46]

As noted above in Part III.A., any consideration of the defendant's duty in this case must, of course, begin with the CPLA. Where the CPLA is silent, we will look to relevant Connecticut common law for guidance. Moreover, although the defendant argues for a sweeping holding that it owed no duty to the plaintiffs under any theory whatever, our determination of whether Du Pont can be held responsible in the circumstances presented proceeds on a claim by claim basis.[47]

### (1)

The plaintiffs first claim that Du Pont was negligent in marketing Teflon to Vitek "although it knew or should have known that Vitek was employing the Teflon in a manner for which Teflon was inappropriate and dangerous," and that the defendant was negligent "in that it failed to take reasonable steps to determine the use for which Vitek was employing Teflon, although it knew or should have known that Vitek was likely to use the Teflon in a manner which would expose the users of implants of which the Teflon was a component to serious and foreseeable harm by reason of the notice of the polymer substance."[48] Significantly, each of these allegations of negligence turns, in part, on whether the defendant continued to sell

42. *See* Defendant's Memorandum at 5–6.

43. *Id.* at 10. This rule is sometimes referred to as the "sophisticated user/bulk supplier defense." *See, e.g., Donahue v. Phillips Petroleum Co.,* 866 F.2d 1008 (8th Cir.1989); *Manning v. Ashland Oil Co.,* 721 F.2d 192 (7th Cir.1983).

44. Defendant's Memorandum at 5.

45. *Id.* at 10–12; *see* note 44, *supra.*

46. *See, e.g., Basko v. Sterling Drug, Inc.,* 416 F.2d 417 (2d Cir.1969); *Goodson v. Searle Laboratories,* 471 F.Supp. 546 (D.Conn.1978).

47. The court notes, however, that the defendant does not address the plaintiffs' complaints on a claim by claim basis. Nor does it frame the bulk of its arguments in terms of Connecticut law, although it does touch on the Connecticut law governing duty-to-warn and breach of warranty cases.

48. Complaints at ¶¶ 7(C), (D) (emphasis supplied).

Teflon to Vitek when it knew or should have known that Vitek's use of Teflon was dangerous or inappropriate.

■■■ As noted above in Part III.A., the CPLA does not appear to govern the elements of a products liability action for negligent marketing of a defective or dangerous product—indeed, it is silent on the subject. However, it is clear that the requirements of duty, causation and foreseeability applicable to ordinary negligence actions are also applicable to negligence claims against product manufacturers.[49] We address here the duty requirement. Under Connecticut common law, a defendant owes a duty of care if a reasonably prudent person in the defendant's position, "knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." *Coburn v. Lenox Homes*, 186 Conn. 370, 375, 441 A.2d 620 (1982); *see also Coburn v. Lenox Homes, Inc.*, 173 Conn. 567, 575–76, 378 A.2d 599 (1977). Whether the defendant owed the plaintiffs a duty of care is an issue of law. *Gordon v. Bridgeport Housing Authority*, 208 Conn. 161, 171, 544 A.2d 1185 (1988); *Nolan v. New York, N.H. & H.R. Co.*, 53 Conn. 461, 471, 4 A. 106 (1886).

■■ Applying this test to the undisputed facts of this case, it is clear that Du Pont owed no duty of care to the plaintiffs: the defendant neither knew, nor in the circumstances should have known, that the Proplast TMJ Implant was dangerous to recipients. Even assuming *arguendo* that Du Pont

should have known that Vitek would use Du Pont's Teflon to make Proplast for use in the Proplast TMJ Implant, the record reveals that Du Pont had little knowledge regarding the safety of using Teflon in medical applications generally and in the Proplast TMJ Implant in particular, and that the bulk of the knowledge it did have was far from current when the plaintiffs received their implants in 1985 and 1986.

The plaintiffs argue that Du Pont knew of the dangers associated with the use of Teflon in the Proplast TMJ Implant because the defendant was aware by 1967 of two studies dating from the late 1950's or early 1960's questioning the use of PTFE in medical implants.[50] Du Pont does not appear to dispute that it was aware of the studies. However, both studies antedate the development of the Proplast TMJ Implant by nearly 20 years. Moreover, they appear to address the use of pure PTFE only and not Proplast—the Teflon composite material used in the implants at issue.[51] Nor do they purport to concern the safety of using either PTFE or Proplast in TMJ implants specifically. Instead, they have only a tangential relationship to the allegedly defective product at issue in this case—a product used as a TMJ implant and composed of Proplast, not pure PTFE. Moreover, when Du Pont made Homsy aware of these studies by letter in 1967,[52] Homsy responded by noting that those and other studies were "crucially incomplete," and that they addressed applications different from his own use of Du Pont Teflon.[53] In short, it simply cannot be said that Du Pont either knew or should have known that

49. *See Coburn v. Lenox Homes, Inc.*, 186 Conn. 370, 374–75, 441 A.2d 620 (1982); Wright, *Connecticut Jury Instructions*, Vol. 2, Sec. 512(i) (1976); *see also* text accompanying note 28, *supra.*

50. *See* the following exhibits to the Plaintiffs' Memorandum: Exhibit F, an article "An Artificial Bearing in the Hip Joint: Implications in Biological Lubrication" by John Charnley, M.D.; Exhibit H, a Letter of John Charnley to the Editor of *The Lancet*; Exhibit H, an article "Teflon Hip Prostheses in Dogs" by John D. Leidholt, M.D. and Harry Gorman, D.V.M.

51. As noted above in the Background section, Proplast is made by combining Teflon with either carbon or aluminum oxide.

52. *See* letter of G. Wilkins to C. Gonzalez (dated March 13, 1967) Exhibit N to the Plaintiff's Memorandum, a copy of which is indicated to Homsy. This letter also informed Gonzalez and Homsy that Du Pont "Teflon" is "not made for medical uses" and that Du Pont does not "perform the detailed long-time [sic] studies which should be made before these products are employed for purposes such as in medicine and surgery."

53. *See* letter of Charles Homsy to George Wilkins (dated March 20, 1967), Exhibit O to the Plaintiffs' Memorandum.

the Proplast TMJ Implant was dangerous based solely on its knowledge of these two early studies.

The plaintiffs further argue, however, that Du Pont should have learned (and, indeed, did learn) of the dangers associated with the Proplast TMJ Implant when M.W. Bernhardt, an employee of Du Pont, attended the American Association of Oral and Maxillofacial Surgeons Clinical Congress in 1984. As noted above in Part III.B., the Bernhardt Memorandum was prepared to memorialize the highlights of certain papers given at the conference. A number of those papers discussed the "state of the art" of TMJ surgery as well as the various techniques and materials then in use. Nothing in the Bernhardt Memorandum supports the plaintiff's contention that Du Pont either knew or should have known the Proplast TMJ Implant was dangerous. As reported by Bernhardt, some speakers did make negative comments about Proplast,[54] but the speakers' assessments of the material (to the extent that there were such assessments) were not, on the whole, negative. At the very worst, the comments were mixed.[55] None of the speakers who commented unfavorably on Proplast referred to the material as either dangerous or inappropriate for use in TMJ implants. In fact, none of the speakers appears to have addressed the safety of the material at all. It

thus would have been unreasonable for Du Pont to have drawn the conclusion that Proplast was dangerous from those evaluative comments that were made. Moreover, in assessing what Du Pont might have learned regarding the Proplast TMJ Implant from Bernhardt's attendance at the conference, it is significant to note that none of the speakers appears to have addressed or even mentioned that specific medical device.[56] Nor does it appear that Bernhardt attended the conference for the purpose of gathering information on the safety or efficacy of that Vitek product. It is clear from the general tone of the Bernhardt Memorandum that the author's own interest in (and arguably his understanding of) the conference was not particularly technical or medical. The purpose of his attendance appears, rather, to have been the gathering of information on the emerging market in oral and maxillofacial medical products.

In sum, the evidence produced by the plaintiffs in the Bernhardt Memorandum, whether standing alone or taken together with the two early studies discussed above, cannot reasonably be said to support the conclusion that Du Pont knew or should have known of the dangers associated with Vitek's use of Du Pont Teflon in the Proplast TMJ Implant. This conclusion is particularly compelling in light of the fact that, as noted

---

54. For example, Bernhardt reported that one speaker, Dr. William McCarty "concluded his talk with a plea for better biomaterials. The 'Proplast', 'Silastic' and metal prostheses they are using today simply don't do the job." Bernhardt Memorandum at unnumbered page 3.

Another speaker, Dr. Bruce Sanders, reportedly gave a paper entitled "Surgical Failures— What to do next?," in which he listed several reasons for surgical failure involving the TMJ and procedures for addressing failed surgeries. Bernhardt recorded that the "[b]iggest problems with 'Proplast' or 'Silastic' is using too big or thick a prosthesis or not affixing it properly." He also noted that " 'Proplast' is very difficult to remove due to its tendency to fracture into many pieces into which natural tissue grows. 'Silastic' is easier to remove in one piece." *Id.* at unnumbered page 4.

55. For example, Bernhardt reported that one speaker, Dr. Richard Akin, said of Proplast: "Stabilization is good—decreases migration. It is also ultra-porous, has low friction and high wettability"—all positive qualities. Akin also re-

portedly noted that potential problems with Proplast include "perforation or disintegration—deteriorates rapidly." *Id.* at unnumbered page 6.

Another speaker, Dr. Ted Kiersch, gave a paper entitled " 'Proplast' as Disc Replacement." This paper discussed a study of 173 cases using Proplast in TMJ surgery. The Bernhardt Memorandum states that

Ninety-three percent of patients reported at least some degree of improvement. Advantages of "Proplast" include: inert, promotes tissue ingrowth, is easily shaped, easily compressible, low friction due to Teflon surface.

Finally, the most detailed synopsis of any paper included in the Bernhardt Memorandum concerns that given by Homsy, which appears to be entirely devoted to the advantages of Proplast. Homsy is recorded as having stated, among other things, that " 'Proplast,' with appropriate porosity which accommodates substantial tissue ingrowth and softness matching that of ingrowing tissue, is a good candidate for long-term success." *Id.* at unnumbered page 6.

56. *See* Part III.C., *supra.*

594

above in Part II.B.(3), the FDA had approved the use of the Proplast material in medical and surgical applications. Du Pont simply had no reason to doubt the FDA's judgment regarding the material's safety and efficacy. What little negative information the defendant had about the safety of Proplast—a product manufactured by another company, Vitek—was, in some cases, quite old, and, in all cases, balanced by positive information. Moreover, none of the information was generated internally by Du Pont. In such circumstances, to expect Du Pont to conclude that Proplast was dangerous on the basis of limited, dated knowledge that it had acquired second-hand, or even third-hand, would be unreasonable.

Accordingly, it is clear from the undisputed facts that the plaintiffs cannot demonstrate on the basis of this record that the defendant owed any duty to the plaintiffs in marketing Teflon to Vitek for Vitek's use in manufacturing the Proplast TMJ Implant. Thus, under the circumstances presented, the plaintiffs' negligence claims cannot succeed. The defendant neither knew, nor should have known, that the implants were dangerous or that Teflon was not otherwise appropriate for such a use. The defendant is therefore entitled to summary judgment on the plaintiffs' claims for negligence.

(2)

The plaintiffs' second claim is for breach of the implied warranties of fitness and merchantability.[57] As was the case with the plaintiffs' negligence claims, the CPLA is silent as to the elements of a cause of action for breach of warranty.[58] However, there is another statutory source upon which the plaintiffs may rely—the Connecticut Uniform Commercial Code, Title 42a of the Connecticut General Statutes ("CUCC").

There are two specific sections of the CUCC which govern implied warranties arising from the sale of goods. The first, Conn. Gen.Stat. § 42a–2–314, states in pertinent part that

[u]nless excluded or modified as provided by section 42a–2–316, a warranty that the goods shall be merchantable is implied in a contract with respect to goods of that kind . . .

(emphasis supplied). The second, Conn.Gen. Stat. § 42a–2–315, states that

[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 42a–2–316 an implied warranty that the goods shall be fit for such purpose.

(emphasis supplied). Each of these two sections arguably could provide a basis for the plaintiffs' claim here. However, by the plain language of the statute, no implied warranty can arise out of either Sections 42a–2–314 or 42a–2–315, if such a warranty has been "excluded or modified" under Section 42a–2–316.

▪▪▪ The defendant argues that no implied warranty can be said to exist with respect to the Proplast TMJ Implant, since Du Pont stated explicitly in a notice to Vitek that Teflon was not made for medical or surgical use, and that Du Pont did not warrant its safety for that purpose.[59] The court agrees. Under CUCC § 42a–2–316,

all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the buyer's attention to the

57. Complaints at ¶¶ 7(E).

58. See Part III.A., supra.

59. See "Statement of Policy Regarding the Medical or Surgical Uses of Plastic Materials" from Du Pont to Vitek (dated May 13, 1977), Exhibit 1 to the Affidavit of John S. Lindell (dated Nov. 1, 1991) (the "Notice"). The Notice bears the apparent signature of Homsy (dated May 16, 1977) and states in part that

Du Pont Teflon fluorocarbon resins . . . are made for industrial purposes only. We conduct such tests as are needed to protect the ordinary users of these products but do not perform the detailed, long-term studies which should be made before they are used for medical or surgical purposes. . . . [P]ersons proposing to evaluate these products for medical or surgical purposes must rely on their own medical and legal judgment without any representation on our part.

exclusion of warranties and makes plain that there is no implied warranty.

There can be no doubt that the Notice provided to Vitek contains language which calls attention to the fact that Du Pont did not intend to warrant Teflon for medical or surgical uses and that, in the circumstances presented, Vitek never believed Du Pont was warranting its product for such a use.

There is simply no basis on this record for the plaintiffs' claim that the defendant breached any implied warranty of merchantability or fitness, since Du Pont disclaimed all implied warranties in the Notice to Vitek. Simply put, no such warranty ever existed with respect to the use of Du Pont Teflon in surgical or medical applications. Accordingly, Du Pont is entitled to summary judgment on the plaintiffs' claims for breach of implied warranty.

(3)

We turn, finally, to the plaintiffs' claims that Du Pont failed to warn either the recipients of the implants or the medical profession of the dangers associated with the use of Teflon in the Proplast TMJ Implant. The CPLA provides in part that

[A] Product Seller may be subject to liability for harm caused to a claimant who proves by a preponderance of the evidence that the product was defective in that adequate warnings or instructions were not provided.

Conn.Gen.Stat. § 52–572q(a). That statute further establishes standards for determining whether a product is, in fact, defective due to a defendant's failure to warn,[60] and whether the defective product caused the plaintiff's injuries.[61] The CPLA does not, however, appear to address whether a defendant can be held liable for failure to warn under circumstances such as those presented here—where the defendant neither knows, nor has reason to know, that the product is dangerous.[62] Although the statute is silent on this issue, the Connecticut Supreme Court has made it clear that a "seller is under a duty to give adequate warnings of unreasonable dangers involved in the use of which he knows, or should know," *Giglio v. Connecticut Light & Power Co.*, 180 Conn. 230, 234, 429 A.2d 486 (1980). That is, there is a duty to warn of those dangers which are known, or which should be known to the defendant. Similarly, in *Tomer v. American Home Products, Corp.*, 170 Conn. 681, 689, 368 A.2d 35 (1976), the Supreme Court held that

[i]f a manufacturer knows or should know that a product may cause serious injury to users, but does not warn of the potentially injurious effects either through negligence or because of concern that the sales of the product would thereby be reduced, he cannot be absolved from the imposition of strict liability in tort....

In other words, no duty to warn arises where the seller is justifiably ignorant of such dangers. Moreover, the Supreme Court in both *Giglio* and *Tomer* cited with approval *Basko v. Sterling Drug, Inc.*, 416 F.2d 417, 426 (2d Cir.1969), which states succinctly that "there is no duty to warn of unknown or unforeseeable risks." [63]

It is therefore clear that no duty to warn existed in the circumstances presented. As noted above in Part III.C.(1), even assuming *arguendo* that Du Pont should have known its Teflon would be incorporated into the Proplast TMJ Implant, the defendant neither

---

**60.** Conn.Gen.Stat. § 52–572q(b) provides that [i]n determining whether instructions were required and, if required, whether they were adequate, the trier of fact may consider: (1) The likelihood that the product would cause the harm suffered by the claimant; (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm; and (3) the technological feasibility and cost of warnings and instructions.

**61.** Conn.Gen.Stat. Section 52–572q(c) provides that

[i]n claims based on this section, the claimant shall prove by a fair preponderance of the evidence that if adequate warnings or instructions had been provided, the claimant would not have suffered the harm.

**62.** *See* Part III.A., *supra.*

**63.** In *Basko*, the Court of Appeals for the Second Circuit, applying Connecticut law, established the so-called "learned intermediary doctrine" applicable to a pharmaceutical manufacturer's duty to warn patients of the risks associated with the use of its drugs.

knew, nor had reason to know, of the dangers associated with that use. Summary judgment should thus be granted against the plaintiffs' claim for failure to warn.

(4)

Because the court concludes that the defendant is entitled to summary judgment on other grounds, we need not reach the defendant's argument based on the so-called "sophisticated use/bulk supplier defense." Nor need we address the defendant's claim that it would be unreasonable to hold Du Pont responsible for the safety of Vitek's product in light of the federal regulatory scheme which places the responsibility for the safety of medical devices on the manufacturer and not a supplier of raw materials to that manufacturer.

## CONCLUSION

Upon a review of the record, and for the reasons stated above, the defendant's Motion for Summary Judgment (filed Jan. 15, 1992) (doc. # 42) is hereby GRANTED as to all of the plaintiffs' claims. Accordingly, judgment shall enter for the defendant.

It is so ordered.