38 F.3d 988
 Prod.Liab.Rep. (CCH) P 14,061
NATIONAL BANK OF COMMERCE OF EL DORADO, as Administrator of
the Estate of Margaret Armon Wilson, Deceased, Appellant,
v.
KIMBERLY-CLARK CORPORATION, Appellee.
 No. 93-3012.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 17, 1994.
Decided Oct. 25, 1994.
Rehearing and Suggestion for Rehearing
En Banc Denied Dec. 19, 1994.
 
 James B. McMath, Little Rock, AR, argued (Sandy S. McMath, on the brief), for appellant.
 James K. Horstman, Chicago, IL, argued (Barry L. Kroll, Rodney VanAusdal and Lloyd E. Williams, Jr., on the brief), for appellee.
 Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 Margaret Armon Wilson allegedly died as a result of toxic shock syndrome (TSS) caused by her use of tampons manufactured by Kimberly-Clark Corporation. The administrator of her estate, National Bank of Commerce of El Dorado, sued Kimberly-Clark for wrongful death, asserting that Kimberly-Clark failed to test, design, manufacture, and label its tampons adequately. Kimberly-Clark moved for summary judgment on the ground that all of these claims were preempted by the Medical Devices Amendments Act of 1976 (MDA), in which Congress delegated the regulation of medical devices to the Food and Drug Administration (FDA). The district court granted Kimberly-Clark's motion and National Bank appeals.
 
 
 2
 * The only question before the court is the scope of the MDA's statutory preemption provision, codified at 21 U.S.C. Sec. 360k(a), which provides that
 
 
 3
 no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
 
 
 4
 (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.
 
 
 5
 As the agency charged with administering the MDA, the FDA has issued an interpretive regulation that deals specifically with the question of preemption. See 21 C.F.R. Sec. 808.1. Two sections of that regulation cast light on the issues presented by this case. First, the FDA indicated that the statute was intended to preempt any state requirement "whether established by statute, ordinance, regulation, or court decision," id. Sec. 808.1(b); and second, such "State or local requirements are preempted only when the [FDA] has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act...." Id. Sec. 808.1(d).
 
 
 6
 Under the MDA, a medical device receives one of three classifications depending on the level of regulation or control deemed necessary to provide reasonable assurance of the safety and effectiveness of that device. Devices requiring the least regulation are placed in class I, and those requiring the most are placed in class III. See 21 U.S.C. Sec. 360c. Tampons have been placed in class II, see 21 C.F.R. Secs. 884.5460, 884.5470, which means that the FDA may impose "performance standards," or may require, for example, "postmarket surveillance" or "patient registries." 21 U.S.C. Sec. 360c(a)(1)(B).
 
 
 7
 Beyond classifying tampons as class II medical devices, the FDA has issued only one regulation involving tampons. Under 21 C.F.R. Sec. 801.430, tampons must be labeled in such a way as to inform consumers of (1) the dangers of TSS, (2) means by which women may avoid or reduce the risk of contracting tampon-associated TSS, and (3) the absorbency rating of the particular tampon as measured by a test method prescribed by the FDA. The FDA mandates only the content of the warning and, to some extent, its location on the packaging, but premarket approval of the actual design of the warning is not required.
 
 II
 
 8
 Following the First Circuit decision in King v. Collagen Corp., 983 F.2d 1130 (1st Cir.) ("Collagen Corp."), cert. denied, --- U.S. ----, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993), the district court held that National Bank's entire cause of action was preempted. See National Bank of Commerce of El Dorado v. Kimberly-Clark Corp., No. 91-1068, slip op. at 3 (W.D.Ark. July 16, 1993). National Bank argues that none of its cause of action is preempted because the FDA has only imposed minimum requirements on tampon labeling. If any of its claim is preempted, it argues, it can only be for failure to warn, and if so, only to the extent that any potential state law requirement would exceed that imposed by the FDA.
 
 
 9
 It is clear to us, as it has been clear to every court that has published a decision on the issue, that to the extent National Bank's claim against Kimberly-Clark seeks to impose any warning requirement beyond that imposed by 21 C.F.R. Sec. 801.430, it is preempted by 21 U.S.C. Sec. 360k(a). See Moore v. Kimberly-Clark Corp., 867 F.2d 243 (5th Cir.1989); Bejarano v. International-Playtex, Inc., 750 F.Supp. 443 (D.Idaho 1990); Krause v. Kimberly-Clark Corp., 749 F.Supp. 164 (W.D.Mich.1990); Northrip v. International Playtex, Inc., 750 F.Supp. 402 (W.D.Mo.1989); Lindquist v. Tambrands, Inc., 721 F.Supp. 1058 (D.Minn.1989); Cornelison v. Tambrands, Inc., 710 F.Supp. 706 (D.Minn.1989); Meyer v. International Playtex, Inc., 724 F.Supp. 288 (D.N.J.1988); Lavetter v. International Playtex, 706 F.Supp. 722 (D.Ariz.1988); Rinehart v. International Playtex, Inc., 688 F.Supp. 475 (S.D.Ind.1988); Edmondson v. International Playtex, Inc., 678 F.Supp. 1571 (N.D.Ga.1987); Stewart v. International Playtex, Inc., 672 F.Supp. 907 (D.S.C.1987); Poloney v. Tambrands, Inc., 260 Ga. 850, 412 S.E.2d 526 (1991); Lulov v. Tambrands, Inc., 198 A.D.2d 479, 604 N.Y.S.2d 206 (App.Div.1993); Berger v. Personal Prods., Inc., 115 Wash.2d 267, 797 P.2d 1148 (1990), cert. denied, 499 U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991). National Bank acknowledges the weight of these authorities, but argues that these decisions reflect nothing more than a "follow the leader" mentality.[1] In National Bank's view, each of these decisions fails adequately to address its argument that the labeling requirements in 21 C.F.R. Sec. 801.430 represent a floor rather than a ceiling; that the FDA has simply imposed the minimum requirements a manufacturer must meet, to which states may add additional requirements through their respective tort laws.
 
 
 10
 National Bank's argument fails for two reasons. First, the "requirements" that section 360k(a) preempts include those imposed by state tort law. The FDA understands the statute to preempt state tort law, see 21 C.F.R. Sec. 808.1(b), and its interpretation of a statute it administers is controlling so long as that interpretation is a reasonable one, as it is in this instance. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); Collagen Corp., 983 F.2d at 1134. This interpretation of the statute is supported by Cipollone v. Liggett Group, Inc., --- U.S. ----, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), in which the Court held that statutory language preempting any "requirement or prohibition" "sweeps broadly and suggests no distinction between positive enactments and common law." Id. at ----, 112 S.Ct. at 2620. We agree with the Fifth Circuit that "[i]t would be anomalous to interpret the MDA differently from [the statutory language at issue in Cipollone] solely on the basis that while they both employ 'requirement,' the MDA omits 'prohibition.' " Stamps v. Collagen Corp., 984 F.2d 1416, 1421 (5th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 86, 126 L.Ed.2d 54 (1993); see also Gile v. Optical Radiation Corp., 22 F.3d 540, 542-43 (3d Cir.1994); Mendes v. Medtronic, Inc., 18 F.3d 13, 18 (1st Cir.1994); Slater v. Optical Radiation Corp., 961 F.2d 1330, 1332-33 (7th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 327, 121 L.Ed.2d 246 (1992).
 
 
 11
 The second reason we must reject National Bank's argument that the FDA's regulations simply constitute minimum requirements that may be exceeded by state tort law is the express language of the statute. As this is a case of express rather than implied preemption, "the preemptive scope of [the MDA] is governed entirely by the express language" of the statute. Weber v. Heaney, 995 F.2d 872, 875 (8th Cir.1993). Section 360k(a) provides that "any requirement--(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device" is preempted. This language is patently inconsistent with National Bank's assertion that the requirements imposed under the MDA are simply minimum requirements.
 
 
 12
 Many of the cases cited by National Bank in support of its argument involve implied preemption, which occurs when, despite the lack of any express statutory preemption, the federal government has so occupied a field as to leave no room for states to act. See, e.g., Burlington N. R.R. Co. v. Minnesota, 882 F.2d 1349, 1352 (8th Cir.1989). Several cases cited by National Bank--particularly those involving the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. Secs. 136-136y--apply implied preemption principles despite the presence of express statutory preemption provisions. See, e.g., Ciba-Geigy Corp. v. Alter, 309 Ark. 426, 834 S.W.2d 136, 141-45 (1992) (finding that FIFRA does not preempt state tort claim for inadequate labeling of herbicide). Two responses can be made to such cases: First, Cipollone makes clear that when a statute includes an express preemption provision, we must focus on the statutory language rather than apply implied preemption principles. See --- U.S. at ----, 112 S.Ct. at 2618; id. at ----, 112 S.Ct. at 2625 (Blackmun, J., concurring); see also Mendes, 18 F.3d at 16 (implied preemption principles inapplicable to MDA); Stamps, 984 F.2d at 1420 (same). Second, to the extent that FIFRA's preemption provision is similar to that found in the MDA--a matter we shall take up further infra--we share the view of the various courts of appeals that, in examining the language post-Cipollone, have found that FIFRA does preempt state tort claims based on inadequate labeling to the extent that the tort claims would impose requirements "different from" or "in addition to" those imposed by FIFRA and the regulations promulgated thereunder. See, e.g., MacDonald v. Monsanto Co., 27 F.3d 1021 (5th Cir.1994); Worm v. American Cyanamid Co., 5 F.3d 744 (4th Cir.1993); King v. E.I. Dupont de Nemours & Co., 996 F.2d 1346 (1st Cir.), cert. dismissed, --- U.S. ----, 114 S.Ct. 490, 126 L.Ed.2d 440 (1993); Shaw v. Dow Brands, Inc., 994 F.2d 364 (7th Cir.1993); Papas v. Upjohn Co., 985 F.2d 516 (11th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); Arkansas-Platte & Gulf Partnership v. Van Waters & Rogers, Inc., 981 F.2d 1177 (10th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 60, 126 L.Ed.2d 30 (1993).
 
 III
 
 13
 Having determined that, as a general matter, the MDA expressly preempts claims under state tort law for inadequate labeling or failure to warn, we must next determine the precise contours of that preemption. Various courts have recognized (either implicitly or explicitly) that state tort law may impose liability for failure to warn when a tampon label fails to meet the requirements imposed by federal regulations. See, e.g., Sloman v. Tambrands, Inc., 841 F.Supp. 699, 702-03 (D.Md.1993); Krause, 749 F.Supp. at 169; Northrip, 750 F.Supp. at 405; Lindquist, 721 F.Supp. at 1064-65; Meyer, 724 F.Supp. at 294; Rinehart, 688 F.Supp. at 477; Stewart, 672 F.Supp. at 910; Poloney, 412 S.E.2d at 851-52. Only state requirements that exceed or are different from those imposed by the FDA are preempted, these courts have reasoned, so state tort law may impose liability on those occasions when a manufacturer has failed to comply with the FDA's labeling requirements.
 
 
 14
 National Bank concedes that the label in question included all of the language required by the FDA, but argues that Kimberly-Clark failed to display this warning on the package as required by 21 C.F.R. Sec. 801.430(d)-(e). Section 801-430(d) directs that the required consumer information be displayed "prominently and legibly, in such terms as to render the information likely to be read and understood by the ordinary individual under customary conditions of purchase and use." We must first determine whether such a cause of action does, in fact, survive the MDA's preemption provision, and then, should we so find, consider whether National Bank has presented sufficient evidence to survive summary judgment on the issue of compliance.[2]
 
 
 15
 * We must address two potentially distinct questions regarding the degree to which National Bank's claim for failure to warn is preempted. First, does the statutory language standing alone mandate complete preemption of this claim; and second, if the statutory language does not mandate preemption, is preemption warranted as a result of actions taken by the FDA within its statutory authority?
 
 
 16
 * Although we appear to be the first court of appeals to address this aspect of the MDA's statutory preemption provision, at least one other court of appeals has addressed the issue in similar statutory contexts. In both Worm v. American Cyanamid Co., 970 F.2d 1301 (4th Cir.1992), and Moss v. Parks Corp., 985 F.2d 736 (4th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 2999, 125 L.Ed.2d 693 (1993), the Fourth Circuit held that statutory preemption provisions similar to that found in the MDA do not prevent plaintiffs from recovering under state tort law for a defendant's failure to comply with the federal requirement.
 
 
 17
 Worm involved FIFRA's preemption provision, which prohibits states from "impos[ing] or continu[ing] in effect any requirements for labeling or packaging [of pesticides, herbicides, etc.,] in addition to or different from those required under this subchapter." 7 U.S.C. Sec. 136v(b). Because only those state labeling requirements that are "in addition to or different from" the federal standards are preempted, the court held that states are free to impose identical standards "even if the state law provides compensation or other remedies for a violation." Id. at 1307. "[S]o long as Congress chooses not to explicitly preempt the consistent law, it will not be said to be in conflict with federal law." Id. (citing Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 256, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984)).
 
 
 18
 Although the Worm court recognized that imposition of liability to the full extent of the common law was preempted by the federal labeling requirements, id., it went on to hold that imposition of state tort liability (whether by statute or common law) for failure to comply with the federal standard was not preempted. Id. at 1308. The court reasoned that "if the sole fact that a state chooses to regulate labeling, in any manner, were to constitute a state labeling requirement 'in addition to' the federal scheme, then the 'or different from' language would be read completely out of" the statute. Id. The court also relied on the Supreme Court's interpretation of similar language in the Federal Meat Inspection Act in Jones v. Rath Packing Co., 430 U.S. 519, 531-32, 97 S.Ct. 1305, 1312-13, 51 L.Ed.2d 604 (1977), in which the Court held not that the mere existence of a state labeling requirement offended the "in addition to, or different than" preemption clause at issue, but that the different requirements imposed by the state law were the problem. See Worm, 970 F.2d at 1308.
 
 
 19
 The Fourth Circuit addressed the same question, albeit in a different statutory context, in Moss. There the court was dealing with the preemption clause in the Federal Hazardous Substances Act (FHSA), which provides that "no State ... may establish or continue in effect a cautionary labeling requirement applicable to such substance or packaging designed to protect against the same risk of illness or injury unless such cautionary labeling requirement is identical to the labeling requirement under" the FHSA. 15 U.S.C. Sec. 1261 note (b)(1)(A). (Both the Fourth and the Ninth Circuits consider this language essentially identical to that found in FIFRA. See Moss, 985 F.2d at 740 n. 3.) Following Worm, the court held that "in an area of limited congressional preemption such as the FHSA, a common law tort action based upon failure to warn may only be brought for noncompliance with existing federal labeling requirements." Moss, 985 F.2d at 740.
 
 
 20
 We agree with the conclusions of the Worm and Moss courts and of the district courts cited above that when a statute only preempts state requirements that are different from or in addition to those imposed by federal law, plaintiffs may still recover under state tort law when defendants fail to comply with the federal requirements. This does not end our preemption analysis, however, for Kimberly-Clark argues that regardless of the scope of the statutory preemption, the claim in this case is preempted because the FDA actually approved the label in question.[3]
 
 2
 
 21
 Under our statutory analysis in part II, supra, it is apparent that should the FDA change its approach toward the regulation of tampons, the preemptive scope of the MDA could conceivably change as well. For example, if the FDA were to reclassify tampons as class III devices, and thereby subject them to an exhaustive premarket approval process, all claims involving tampons might well be preempted.
 
 
 22
 Less drastic changes could just as easily change the preemptive scope of the MDA. Without reclassifying tampons, the FDA could issue regulations or simply modify its procedures to require that all tampon labeling be approved by the FDA prior to marketing.[4] Such approval would, in my view, preempt any possible claim for failure to comply under state tort law. Kimberly-Clark argues that its label received such approval--an argument that the district court accepted, see National Bank of Commerce of El Dorado v. Kimberly-Clark Corp., No. 91-1068 (W.D.Ark. July 16, 1993)--and that any claim predicated on inadequate labeling is therefore preempted.
 
 
 23
 In support of its position, Kimberly-Clark points to the affidavit of its vice president, Bonnie B. Wan, see Kimberly-Clark App. 143-46, and to a letter it received from Dr. Lillian Yin, an administrator at the FDA. See id. at 189. Wan's affidavit asserts that when Kimberly-Clark originally submitted its proposed labeling to the FDA, which it must do under Sec. 510(k) of the Food, Drug, and Cosmetic Act (21 U.S.C. Sec. 360(k)) and 21 C.F.R. Sec. 807.87(e) to receive permission to market, the FDA asked that certain changes be made. Id. at 144-45. Kimberly-Clark made those changes, resubmitted the labeling, and received permission to market via the aforementioned letter from Dr. Yin. Id. at 145.
 
 
 24
 The district court found that because the FDA is under a statutory duty to monitor the marketplace for lack of compliance with its regulations, submission of the proposed labeling followed by receipt of permission to market can only occur if the FDA actually confirms that the labeling complies with the applicable regulations. In so ruling, the district court cited simply to Cipollone and to a First Circuit decision involving a class III device, which, as noted earlier, is subject to stringent premarket approval. See National Bank of Commerce of El Dorado v. Kimberly-Clark Corp., No. 91-1068, slip op. at 3 (W.D.Ark. July 16, 1993) (citing Collagen Corp., 983 F.2d 1130); see also supra n. 4.
 
 
 25
 The district court's determination that the FDA actually approved the labeling at issue is undercut by a reading of the letter granting Kimberly-Clark permission to market. The letter from Dr. Yin states that the FDA has "reviewed your Section 510(k) notification of intent to market the device referenced above and ... [has] determined the device is substantially equivalent to devices marketed in interstate commerce prior to ... the enactment of the [MDA]. You may, therefore, market the device...." Kimberly-Clark App. 189. The letter continues, however, to state that "[a]n FDA finding of substantial equivalence ... results in a classification for your device and permits your device to proceed to the market, but it does not mean that the FDA approves your device." Id. (emphasis in original). "Therefore," Dr. Yin cautions, "you may not promote or in any way represent your device or its labeling as being approved by the FDA." Id. (third emphasis in original). The letter closes by instructing Kimberly-Clark where to turn for "specific advice on the labeling for [its] device," referring it to the "Division of Compliance Operations." Id.
 
 
 26
 The express language of the 510(k) letter appears to indicate that the district court erred when it found that the labeling had been approved. One might argue that while the FDA does in fact confirm that proposed labeling complies with its requirements, the cautionary language simply warns the manufacturer that it may not include such phrases as "FDA-approved" in its advertising. If the warning simply stated that the manufacturer could not "promote" the "product" as FDA approved, this argument would carry a great deal of weight. Such is not the language of the letter, however.
 
 
 27
 It is difficult to conceive of a circumstance under which a manufacturer would feel compelled to advertise that its labeling had been approved by the FDA; rather, the language prohibiting the manufacturer to "in any way represent" that the "labeling" is FDA approved applies precisely to the circumstance before us. What the FDA said, in effect, was that in granting permission to market the product, it did not necessarily approve the labeling. See 21 C.F.R. Sec. 807.97 (determination by the FDA of "substantial equivalence" pursuant to Sec. 510(k), which results in the FDA granting a manufacturer permission to market, "does not in any way denote official approval of the device"); see also Jeffrey N. Gibbs & Bruce F. Mackler, Food and Drug Administration Regulation and Products Liability: Strong Sword, Weak Shield, 22 Tort & Ins.L.J. 194, 228 n. 213 (1987) ("FDA does not approve 510(k) notices, but 'accepts' them" (citing 21 C.F.R. Sec. 807.97)). Should the FDA, for example, in fulfilling its duty to monitor the marketplace, later determine that the product is in fact misbranded, it is doubtful that Kimberly-Clark could assert a successful defense based on the 510(k) letter. See Sandra J.P. Dennis, Promotion of Devices: An Extension of FDA Drug Regulation or a New Frontier?, 48 Food & Drug L.J. 87, 90 (1993) ("a 510(k) clearance letter does not protect the manufacturer against a future challenge to its labeling or advertising statements").
 
 
 28
 In ruling on preemption questions, I, at least, am ever mindful of the "strong presumption against preemption" of state tort law. Weber, 995 F.2d at 872; see also California v. ARC America Corp., 490 U.S. 93, 101, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989). With that presumption in mind, I have little choice but to conclude that the district court erred in holding that the FDA had approved the label at issue. My review of the record and of the applicable statutes and regulations suggests that, at least in the context of a class II device, the 510(k) process results in no more than permission to market. Because it appears that the FDA can grant such permission without an express determination of compliance, I conclude, writing only for myself, that National Bank's claim under state tort law for failure to comply with the FDA labeling requirements is not preempted.[5]
 
 B
 
 29
 I turn next to Kimberly-Clark's argument that regardless of whether the failure-to-comply aspect of the claim for failure to warn is preempted, National Bank has not produced sufficient evidence on the issue to survive summary judgment. Although the possibility of a claim for failure to warn based on a failure to comply with 21 C.F.R. Sec. 801.430 has been recognized by the various district courts cited above, see supra at 992, I have found no case in which such a claim has succeeded. Most courts have disposed of these claims on summary judgment, finding the label in question to have met the FDA's requirements as a matter of law. See, e.g., Sloman, 841 F.Supp. at 703. Only one published decision specifically refused to grant a defendant summary judgment on the question of whether the label complied with FDA regulations, and it did so in a rather conclusory fashion. See Rinehart, 688 F.Supp. at 478.
 
 
 30
 To support its assertion that the label in this case does not comply with section 801.430, National Bank has provided an affidavit on the issue by a purported expert in risk communication. Although the three-page affidavit itself is rather conclusory, the record also includes a deposition of this expert that amplifies his conclusions considerably. See I Nat'l Bank App. 108-83. Many of the expert's statements appear to be comparative in nature (i.e., other tampon packaging complies with the FDA requirements), and these assertions, on their own, seem to support a finding that the warning is not reasonable in the expert's view rather than that it does not comply with section 801.430. The expert does assert, however, that the type size is too small (5-point rather than 7-point) to be read by one-quarter to one-half of customers at a distance of one to two feet, that the warning would not be understood by the ordinary customer because the language used is not consistent with a sixth- to eighth-grade reading ability, and that the warning is too brief and dense to be legible or understandable to the consuming public. He also states that certain portions of the warning should be in boldface or in different colors in order to satisfy the prominence and legibility requirements, and that any proposed warning should be tested with focus groups to confirm that it is understood as intended.
 
 
 31
 Unlike the majority of the cases in which defendants have successfully moved for summary judgment on the compliance issue, National Bank has provided, via the expert's deposition, fairly specific statements of how the warning at issue fails to comply with the requirements that it be prominent, legible, and understandable. Although some of these criticisms simply support the expert's apparent preference that the regulation be more exacting, see Lindquist, 721 F.Supp. at 1065, several of them go specifically to the question of whether this label complies with the FDA's requirements. Also, unlike, for example, the label at issue in Sloman, Lindquist, and Lulov (cases involving the Tampax warning label), there is no evidence of other courts rejecting the specific deficiencies presented by National Bank.[6] Viewing the expert's deposition in the light most favorable to National Bank, I cannot say that the label in question complied with the FDA requirements as a matter of law, and I would instead leave this question for the factfinder.
 
 IV
 
 32
 The remaining question is whether National Bank's claims regarding the testing, design, and manufacture of the tampon are preempted by section 360k(a). Kimberly-Clark argues that they are, relying almost exclusively on cases involving class III medical devices, which, as noted above, are subject to greater regulation than are class II devices. Specifically, class III devices are subject to a thorough premarket approval process, to which class II devices are not subject. See 21 U.S.C. Secs. 360c(a)(1), 360e.
 
 
 33
 The only court of appeals decision dealing with the preemptive scope of FDA regulation of class II devices is Moore, in which the Fifth Circuit held that only the labeling claims were preempted. 867 F.2d at 246-47. Kimberly-Clark argues that Moore was incorrectly decided and that it "plainly could not be decided in the same way under current law" because it relied on implied preemption principles. Kimberly-Clark Br. 34. Although it is true that Moore relied in part on implied preemption principles, which Kimberly-Clark correctly suggests is inappropriate after Cipollone, we have little doubt that the Fifth Circuit would have reached the same result had it relied solely on express preemption principles.
 
 
 34
 The Fifth Circuit addressed the continuing validity of Moore in its recent decision in Stamps, which involved a class III device. The court cited Moore as having held "that certain of Moore's state law claims were preempted by the applicable FDA Class II regulations," and Stamps found that the "decision in Moore logically extends to the FDA Class III regulatory context." 984 F.2d at 1421. Moore is upheld in every respect in Stamps and is cited as the controlling authority on the preemption issues; the Stamps court simply goes further, finding preemption of all claims in that case because of the premarket approval process applicable to class III devices. 984 F.2d at 1422; see also Bravman v. Baxter Healthcare Corp., 842 F.Supp. 747, 759 n. 18 (S.D.N.Y.1994) (explaining the difference in the sweep of the preemption in the two cases as a result of the different regulatory apparatus present in each case).
 
 
 35
 Our conclusion that the holding in Moore (if not all of its reasoning) remains good law finds support in the numerous district court decisions that have held that preemption in the class II regulatory context is limited to the realm in which the FDA has acted. See, e.g., Parenteau v. Johnson & Johnson Orthopedics, Inc., 856 F.Supp. 61, 63-64 (D.N.H.1994); Brown v. Medtronic, Inc., 852 F.Supp. 717, 721 (S.D.Ind.1994); Mulligan v. Pfizer, Inc., 850 F.Supp. 633, 635-37 (S.D.Ohio 1994); Elbert v. Howmedica, Inc., 841 F.Supp. 327, 332 (D.Haw.1993); Lamontagne v. E.I. Du Pont de Nemours & Co., 834 F.Supp. 576, 582-86 (D.Conn.1993); Bejarano, 750 F.Supp. at 445-46; Krause, 749 F.Supp. at 168-69; Rinehart, 688 F.Supp. at 477-78; see also Bravman, 842 F.Supp. at 759 (concluding in dicta that "in the Tampon Cases, the courts have tended to find that the FDA's labeling requirements constitute 'counterpart' regulations which preempt state law duty to warn claims, but not design defect claims, or manufacturing claims").
 
 
 36
 By and large the lower courts have relied on the FDA's understanding of the preemptive scope of its regulations, which is somewhat narrower than that proffered by Kimberly-Clark. According to FDA regulations interpreting the MDA's preemption provision, "State or local requirements are preempted only when the [FDA] has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act...." 21 C.F.R. Sec. 808.1(d). The FDA further indicated that "from a plain reading of section [360k(a) ] it is clear that the scope of preemption is limited to instances where there are specific FDA requirements applicable to a particular device or class of devices." 43 Fed.Reg. 18,662 (1978). This interpretation of 21 U.S.C. Sec. 360k(a) is reasonable, although it may not be the only reasonable interpretation, and it is therefore subject to deference under Chevron.
 
 
 37
 Finally, Kimberly-Clark suggests that the FDA considered broader regulation of tampons and chose to limit its regulation to labeling. As a result, it says we should treat the FDA's considered decision not to regulate broadly as preempting National Bank's claims involving testing, design, and manufacture. Such a holding is precluded by the FDA's own regulations, but in addition, it would evince total disregard for the structure of our federal system. Absent clear statutory language to the contrary (or ambiguous statutory language accompanied by a reasonable agency interpretation to the contrary), it would be anomalous to suggest that the FDA may preempt all possible tort actions involving a particular product simply by placing it into a class or by imposing some general control. To the extent that Kimberly-Clark's argument rests solely on section 360k(a), it applies equally to medical devices placed into any one of the three categories. Thus, were we to accept Kimberly-Clark's argument, the FDA would preempt any and all tort actions against manufacturers of, say, crutches or tongue depressors simply by placing those items in class I. We reject this argument as inconsistent with both our and the FDA's reading of the MDA's preemption provision.
 
 V
 
 38
 Reading 21 U.S.C. Sec. 360k(a) rather more narrowly than did the district court, we reverse the grant of summary judgment to Kimberly-Clark and remand for further proceedings consistent with this opinion.
 
 
 39
 LOKEN, Circuit Judge, concurring, with whom Judge FAGG joins.
 
 
 40
 I concur in all of Judge Heaney's thorough and well-reasoned opinion except parts III.A.2. and III.B. My disagreement with those portions of Judge Heaney's analysis is narrow but significant. In my view, FDA has determined that Kimberly-Clark's tampon package labels comply with the applicable federal regulation, 21 C.F.R. Sec. 801.430. Therefore, National Bank's state law claims for failure to comply with this FDA regulation are preempted. See King v. Collagen Corp., 983 F.2d 1130, 1135-36 (1st Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993).
 
 
 41
 FDA has classified menstrual tampons as Class II medical devices. See 21 C.F.R. Secs. 884.5460, 884.5470. Class II devices are those which require "special controls" such as performance standards, in addition to the general controls applicable to Class I devices, in order "to provide reasonable assurance of the safety and effectiveness of the device." 21 U.S.C. Sec. 360c(a)(1)(B). The only special control that FDA has adopted for menstrual tampons is its "user labeling" regulation, 21 C.F.R. Sec. 801.430.
 
 
 42
 In October 1989, FDA significantly amended Sec. 801.430 to adopt a standardized method of expressing product absorbency on tampon package labels, a disclosure the agency considers essential to safe use of these products. In promulgating this amendment, FDA declared, "Any menstrual tampon that is not labeled as required by the final rule and that is initially introduced or initially delivered for introduction into commerce after March 1, 1990, is misbranded under sections 201(n) and 502(a) and (f) of the act." 54 Fed.Reg. 43766, 43770 (Oct. 26, 1989).
 
 
 43
 Kimberly-Clark promptly prepared new package labels to comply with these additional disclosure requirements and submitted the new labels to FDA in a "510(k) Premarket Notification Submission." This is the procedure by which the manufacturer of a new medical device may receive expedited FDA permission to bring the device to market by demonstrating that it is "substantially equivalent" to an existing Class I or Class II device from the standpoint of safety and effectiveness. See 21 C.F.R. Sec. 807.81. In addition, when a manufacturer modifies a Class I or Class II device already on the market in a way that significantly affects its safety or effectiveness, it must file a new 510(k) submission. See 21 C.F.R. Sec. 807.81(a)(3)(iii). That was obviously the basis upon which Kimberly-Clark submitted its new tampon package labels following FDA adoption of the amendments to Sec. 801.430.
 
 
 44
 In the case of most 510(k) submissions, the applicant is required to submit copies of its proposed labels so that FDA can determine the new device's intended use, a critical part of the "substantially equivalent" inquiry. See 21 C.F.R. Secs. 807.87(e), 807.100(b)(1). For that reason, an FDA order permitting the new device to be marketed as substantially equivalent to existing devices would not normally reflect agency approval of the submitted labels. In this case, however, the "special control" adopted by FDA for this Class II device is a labeling requirement, and Kimberly Clark's 510(k) submission was for the specific purpose of allowing the agency a premarket review of new labels intended to satisfy its newly-amended safety regulation.
 
 
 45
 In these circumstances, the specific procedure followed by FDA in reviewing Kimberly-Clark's 510(k) submission demonstrates that the agency approved the proposed new labels. Agency staff met with Kimberly-Clark representatives to review the proposed labels and requested modifications. Kimberly-Clark then submitted revised labels incorporating FDA's requested changes, following which the agency sent Kimberly-Clark a form letter stating that "the device is substantially equivalent to devices marketed in interstate commerce.... You may, therefore, market the device." Of course, the device was already being marketed; the only safety-related change was to the labeling, in response to FDA's amended regulation. Thus, the agency's finding of substantial equivalence necessarily reflected a determination that the labels comply with Sec. 801.430, as amended.
 
 
 46
 If Kimberly-Clark's tampon packaging does not conform to FDA's labeling regulation, the product is "misbranded." See 21 U.S.C. Sec. 352; 21 C.F.R. Sec. 801.430(h). Thus, when new labels were submitted to the agency under its premarket notification submission procedure after Sec. 801.430 was amended, the FDA would have been in dereliction of its statutory duty to prevent medical device misbranding if it had permitted Kimberly-Clark to bring those labels to market without determining that they comply with the new regulation. That FDA gave its permission in a form letter that included the standard non-approval language relied upon by Judge Heaney--language that reflects another of the agency's regulations, see 21 C.F.R. Sec. 807.97--cannot in my view obscure the obvious fact that, as the district court found, FDA did in fact determine that Kimberly-Clark's labels comply with Sec. 801.430. Therefore, all of National Bank's claims for inadequate labeling or failure to warn are preempted.
 
 
 
 [1]
 To buttress its argument, National Bank cites an unpublished district court decision, Muzatko v. International Playtex, Inc., No. 85-C-1540 (E.D.Wis. May 14, 1987), that found no preemption. Although our court rules frown on such citations, see 8th Cir.R. 28A(k), the dearth of federal court of appeals decisions and the plethora of unpublished district court decisions dealing with these issues (many of which have been brought to our attention by Kimberly-Clark) discourage us from chiding either party as we might otherwise. We note, nonetheless, that the many published decisions cited in the text chose not to follow Muzatko (certainly one of the earliest decisions on point), so while some courts may indeed have substituted citation to other decisions for independent analysis, they were nonetheless careful in their selection of authority
 
 
 [2]
 Kimberly-Clark argues on appeal that National Bank may not now raise a claim that the labeling did not comply with FDA regulations because no such claim appears in the complaint. This argument misses the point. The complaint does assert a claim for failure to warn, and the FDA regulations simply serve as the standard by which to measure the defendant's conduct (rather than, for example, a negligence standard imposed by a jury under Arkansas state tort law). See Rinehart, 688 F.Supp. at 478; Poloney, 412 S.E.2d at 851
 The claim for failure to comply with FDA regulations is not a separate claim. National Bank does not contend, for example, that it has an implied federal cause of action under the regulation--and we doubt that such a contention could be made persuasively, see Gile, 22 F.3d at 544; see also Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 810, 106 S.Ct. 3229, 3233, 92 L.Ed.2d 650 (1986)--but it instead contends that its ability to recover under state tort law is only limited to the extent that it seeks to impose duties on Kimberly-Clark in addition to or different from those imposed by the FDA regulations. Theoretically, state tort law might impose a lesser duty than that imposed by the FDA, but under section 360k(a) it may impose no greater duty.
 
 
 [3]
 In the following two sections of this opinion, parts III.A.2 and III.B, I write only on behalf of myself. The court's holding on the issue in III.A.2, which makes it unnecessary for the court to reach the issue in III.B, can be found in Judge Loken's concurring opinion attached hereto
 
 
 [4]
 If such a change were made, the regulation of tampons would then correspond quite closely, at least in this respect, with that of herbicides. Under FIFRA, the EPA is statutorily required to approve herbicide labels. See 7 U.S.C. Sec. 136a(c)(5)(B) (predicating approval of product registration on compliance with labeling requirements); 40 C.F.R. Sec. 152.112(f) (same). In statutory preemption contexts such as these, actual agency approval eliminates any possible claims under state tort law for failure to comply with federal requirements. See, e.g., Collagen Corp., 983 F.2d at 1136 (holding failure-to-warn claim involving class III device preempted because premarket approval process includes approval of labeling)
 
 
 [5]
 Although my disagreement with the concurring opinion's treatment of this issue should be manifest, I do agree with Judges Loken and Fagg that "an FDA order permitting the new device to be marketed as substantially equivalent to existing devices would not normally reflect agency approval of the submitted labels." Infra at 998. Given this statement in the concurrence, I am uncertain of the scope of the holding therein. To the degree that it appears this court's preemption jurisprudence now turns on an examination of the give and take between the FDA and a particular manufacturer, I simply express my profound disagreement with the suggestion that the scope of preemption turns on such case-specific factual inquiries rather than on a more general examination of the FDA's 510(k) procedures
 
 
 [6]
 The only published decisions that deal with the Kotex tampon(s) at issue in this case are Moore and Krause. The Fifth Circuit did not address the compliance question in Moore, but according to the district court, Moore did "not contend that the federal regulations were not complied with." 676 F.Supp. 731, 735 (W.D.La.1987). Similarly in Krause, the court indicated that the plaintiff made no response to Kimberly-Clark's affidavit of compliance. 749 F.Supp. at 169